KAVANAUGH, Circuit Judge,
dissenting:
The Second Amendment to the Constitution provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” In District of Columbia v. Heller, the Supreme Court held that the Second Amendment confers “an individual right to keep and bear arms.” 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In McDonald v. City of Chicago, the Court added that the right to keep and bear arms is a “fundamental” constitutional right implicit in our scheme of ordered liberty and “deeply rooted in this Nation’s history and tradition.” - U.S. -, 130 S.Ct. 3020, 3036, 3042, 177 L.Ed.2d 894 (2010).
In Heller, the Court ruled that the District of Columbia’s ban on the possession of handguns violated the Second Amendment. 554 U.S. at 635, 128 S.Ct. 2783. In the wake of Heller, the District of Columbia enacted a new gun law. As relevant here, D.C. bans possession of most semiautomatic rifles and requires registration of all guns possessed in the District of Columbia. See D.C.Code §§ 7-2501.01(3A)(A)(i), 7-2502.01-.10.
In this case, we are called upon to assess those provisions of D.C.’s law under Heller. In so doing, we are of course aware of the longstanding problem of gun violence in the District of Columbia. In part for that reason, Heller has engendered substantial controversy. See, e.g., J. Harvie Wilkinson III, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L. Rev. 253 (2009); Richard A. Posner, In Defense of Looseness, The New Republic, Aug. 27, 2008, at 32. As a lower court, however, it is not our role to re-litigate Heller or to bend it in any particular direction. Our sole job is to faithfully apply Heller and the approach it set forth for analyzing gun bans and regulations.
In my judgment, both D.C.’s ban on semi-automatic rifles and its gun registration requirement are unconstitutional under Heller.
In Heller, the Supreme Court held that handguns — the vast majority of which today are semi-automatic — are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles. Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses. Moreover, semi-automatic handguns are used in connection with violent crimes far more than *1270 semi-automatic rifles are. It follows from Hellers protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected and that D.C.’s ban on them is unconstitutional. (By contrast, fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after Heller.)[1]
D.C.’s registration requirement, which is significantly more stringent than any other federal or state gun law in the United States, is likewise unconstitutional. Heller and later McDonald said that regulations on the sale, possession, or use of guns are permissible if they are within the class of traditional, “longstanding” gun regulations in the United States. Registration of all lawfully possessed guns — as distinct from licensing of gun owners or mandatory record-keeping by gun sellers — has not traditionally been required in the United States and even today remains highly unusual. Under Heller's history- and tradition-based test, D.C.’s registration requirement is therefore unconstitutional.[2]
It bears emphasis that Heller, while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation. Indeed, Heller largely preserved the status quo of gun regulation in the United States. Heller established that traditional and common gun laws in the United States remain constitutionally permissible. The Supreme Court simply pushed back against an outlier local law— D.C.’s handgun ban — that went far beyond the traditional line of gun regulation. As Heller emphasized: “Few laws in the history of our Nation have come close to the severe restriction of the District’s” law. 554 U.S. at 629, 128 S.Ct. 2783.[3]
*1271 After Heller, however, D.C. seemed not to heed the Supreme Court’s message. Instead, D.C. appeared to push the envelope again, with its new ban on semi-automatic rifles and its broad gun registration requirement. D.C.’s public safety motivation in enacting these laws is worthy of great respect. But the means D.C. has chosen are again constitutionally problematic. The D.C. gun provisions at issue here, like the ban at issue in Heller, are outliers that are not traditional or common in the United States. As with D.C.’s handgun ban, therefore, holding these D.C. laws unconstitutional would not lead to nationwide tumult. Rather, such a holding would maintain the balance historically and traditionally struck in the United States between public safety and the individual right to keep arms — a history and tradition that Heller affirmed and adopted as determining the scope of the Second Amendment right.
I
A key threshold question in this case concerns the constitutional test we should employ to assess the challenged provisions of the D.C. gun law. The Heller Court held that the Second Amendment guarantees an individual right to possess guns. But the Court emphasized that the Second Amendment does not protect “a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” District of Columbia v. Heller, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). “Like most rights, the right secured by the Second Amendment is not unlimited.” Id.
In light of that limiting language in Heller, constitutional analysis of D.C.’s new law raises two main questions. Under Heller, what kinds of firearms may the government ban? And what kinds of regulations may the government impose on the sale, possession, or use of firearms?
Put in simple terms, the issue with respect to what test to apply to gun bans and regulations is this: Are gun bans and regulations to be analyzed based on the Second Amendment’s text, history, and tradition (as well as by appropriate analogues thereto when dealing with modern weapons and new circumstances, see infra Part I.B)? Or may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right? And if the latter, is the proper test strict scrutiny or intermediate scrutiny?
As I read Heller, the Supreme Court was not silent about the answers to those questions. Rather, the Court set forth fairly precise guidance to govern those issues going forward.
A
In my view, Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny. To be sure, the Court never said something as succinct as “Courts should not apply strict or intermediate scrutiny but should instead look to text, history, and tradition to define the scope of the right and assess gun bans and regulations.” But that is the clear message I take away from the Court’s holdings and reasoning in the two cases.
As to bans on categories of guns, the Heller Court stated that the government may ban classes of guns that have been banned in our “historical tradition”— namely, guns that are “dangerous and unusual” and thus are not “the sorts of lawful *1272 weapons that” citizens typically “possess! ] at home.” 554 U.S. at 627, 128 S.Ct. 2783. The Court said that “dangerous and unusual weapons” are equivalent to those weapons not “in common use,” as the latter phrase was used in United States v. Miller, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Heller, 554 U.S. at 627, 128 S.Ct. 2783. Thus, the “Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns” or automatic “M-16 rifles and the like.” Id. at 625, 627, 128 S.Ct. 2783. That interpretation, the Court explained, “accords with the historical understanding of the scope of the right.” Id. at 625, 128 S.Ct. 2783. “Constitutional rights,” the Court said, “are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Id. at 634-35, 128 S.Ct. 2783. The scope of the right is thus determined by “historical justifications.” Id. at 635, 128 S.Ct. 2783. And tradition (that is, post-ratification history) also matters because “examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification” is a “critical tool of constitutional interpretation.” Id. at 605, 128 S.Ct. 2783 (emphasis omitted).
Because the D.C. law at issue in Heller banned handguns (including semi-automatic handguns), which have not traditionally been banned and are in common use by law-abiding citizens, the Court found that the D.C. ban on handgun possession violated the Second Amendment. Stressing the D.C. law’s inconsistency with our “historical tradition,” id. at 627, 128 S.Ct. 2783, the Court stated that “[f]ew laws in the history of our Nation have come close to the severe restriction of the District’s” law, id. at 629, 128 S.Ct. 2783.
As to regulations on the sale, possession, or use of guns, Heller similarly said the government may continue to impose regulations that are traditional, “longstanding” regulations in the United States. Id. at 626-27, 128 S.Ct. 2783. In McDonald, the Court reiterated that “longstanding regulatory measures” are permissible. McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.). Importantly, the Heller Court listed several examples of such longstanding (and therefore constitutionally permissible) regulations, such as laws against concealed carry and laws prohibiting possession of guns by felons. 554 U.S. at 626, 128 S.Ct. 2783. The Court stated that analysis of whether other gun regulations are permissible must be based on their “historical justifications.” Id. at 635, 128 S.Ct. 2783.[4]
In disapproving D.C.’s ban on handguns, in approving a ban on machine guns, and in approving longstanding regulations such as concealed-carry and felon-in-possession *1273 laws, Heller established that the scope of the Second Amendment right — and thus the constitutionality of gun bans and regulations — is determined by reference to text, history, and tradition. As to the ban on handguns, for example, the Supreme Court in Heller never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in Heller and measured D.C.’s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use — and thus that D.C.’s handgun ban was unconstitutional.
Moreover, in order for the Court to prospectively approve the constitutionality of several kinds of gun laws — such as machine gun bans, concealed-carry laws, and felon-in-possession laws — the Court obviously had to employ some test. Yet the Court made no mention of strict or intermediate scrutiny when approving such laws. Rather, the test the Court relied on — as it indicated by using terms such as “historical tradition” and “longstanding” and “historical justifications” — was one of text, history, and tradition. Id. at 626-27, 635, 128 S.Ct. 2783; see Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1463 (2009) (“Absent [from Heller ] is any inquiry into whether the law is necessary to serve a compelling government interest in preventing death and crime, though handgun ban proponents did indeed argue that such bans are necessary to serve those interests and that no less restrictive alternative would do the job.”); Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L. Rev. 375, 380 (2009) (“Rather than adopting one of the First Amendment’s many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of ‘Arms’ and arms-usage are protected absolutely from bans and some types of ‘Arms’ and people are excluded entirely from constitutional coverage.”); id. at 405 (Heller “neither requires nor permits any balancing beyond that accomplished by the Framers themselves.”).[5]
*1274 B
Before addressing the majority opinion’s contrary analysis of Heller and McDonald, it is important to underscore two points regarding Heller's focus on text, history, and tradition.
First, just because gun regulations are assessed by reference to history and tradition does not mean that governments lack flexibility or power to enact gun regulations. Indeed, governments appear to have more flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny. After all, history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court said in Heller.[6] By contrast, if courts applied strict scrutiny, then presumably very few gun regulations would be upheld. Indeed, Justice Breyer made this point in his dissent in Heller when he noted that the majority opinion had listed certain permissible gun regulations “whose constitutionality under a strict-scrutiny standard would be far from clear.” 554 U.S. at 688, 128 S.Ct. 2783 (Breyer, J., dissenting).[7]
So the major difference between applying the Heller history- and tradition-based approach and applying one of the forms of scrutiny is not necessarily the number of gun regulations that will pass muster. Instead, it is that the Heller test will be more determinate and “much less subjective” because “it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor.” McDonald, 130 S.Ct. at 3058 (Scalia, J., concurring).
*1275 To be sure, analyzing the history and tradition of gun laws in the United States does not always yield easy answers. Justice Scalia, the author of the Heller majority opinion, thus acknowledged in his concurrence in McDonald: “No fundamental right — not even the First Amendment — is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character.... Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it. I will stipulate to that.” Id. at 8056-57. That said, the range of potential answers will be far more focused under an approach based on text, history, and tradition than under an interest-balancing test such as intermediate scrutiny. See id. at 3057 n. 9.
Second, when legislatures seek to address new weapons that have not traditionally existed or to impose new gun regulations because of conditions that have not traditionally existed, there obviously will not be a history or tradition of banning such weapons or imposing such regulations. That does not mean the Second Amendment does not apply to those weapons or in those circumstances. Nor does it mean that the government is powerless to address those new weapons or modern circumstances. Rather, in such cases, the proper interpretive approach is to reason by analogy from history and tradition. See Parker v. District of Columbia, 478 F.3d 370, 398 (D.C.Cir.2007) (“[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a ‘search,’ the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol.”) (emphasis added), aff'd sub nom. Heller, 554 U.S. 570, 128 S.Ct. 2783; Tr. of Oral Arg. at 77, Heller, 554 U.S. 570, 128 S.Ct. 2783 (No. 07-290) (Chief Justice Roberts: “[Y]ou would define ‘reasonable’ in light of the restrictions that existed at the time the amendment was adopted.... [Y]ou can’t take it into the marketplace was one restriction. So that would be — we are talking about lineal descendents of the arms but presumably there are lineal descendents of the restrictions as well.”); cf. Kyllo v. United States, 533 U.S. 27, 31-35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (applying traditional Fourth Amendment standards to novel thermal imaging technology); California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (allowing government to view property from airplanes based on common-law principle that police could look at property when passing by homes on public thoroughfares).
The Constitution is an enduring document, and its principles were designed to, and do, apply to modern conditions and developments. The constitutional principles do not change (absent amendment), but the relevant principles must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution’s Framers. To be sure, applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins. But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution.
C
The majority opinion here applies intermediate scrutiny and contends that inter *1276 mediate scrutiny is consistent with Heller and McDonald. The majority opinion employs history and tradition only as a threshold screen to determine whether the law in question implicates the individual right; if so, the majority opinion then subjects the individual right to balancing under the intermediate scrutiny test. As explained above, I disagree with that approach. I read Heller and McDonald as setting forth a test based wholly on text, history, and tradition. Deeper examination of the two Supreme Court opinions— and, in particular, how the Court’s opinions responded to the dissents in the two cases — buttresses my conclusion.
Turning first to Heller. The back and forth between the Heller majority opinion and Justice Breyer’s dissent underscores that the proper Second Amendment test focuses on text, history, and tradition. In his dissent, Justice Breyer suggested that the Court should follow the lead of certain First Amendment cases, among others, that had applied a form of intermediate-scrutiny interest balancing:
The fact that important interests lie on both sides of the constitutional equation suggests that review of gun-control regulation is not a context in which a court should effectively presume either constitutionality (as in rational-basis review) or uneonstitutionality (as in strict scrutiny). Rather, “where a law significantly implicates competing constitutionally protected interests in complex ways,” the Court generally asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests. See Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 402 [120 S.Ct. 897, 145 L.Ed.2d 886] (2000) (Breyer, J., concurring)....
In particular this Court, in First Amendment cases applying intermediate scrutiny, has said that our “sole obligation” in reviewing a legislature’s “predictive judgments” is “to assure that, in formulating its judgments,” the legislature “has drawn reasonable inferences based on substantial evidence.” Turner, 520 U.S., at 195 [117 S.Ct. 1174] (internal quotation marks omitted). And judges, looking at the evidence before us, should agree that the District legislature’s predictive judgments satisfy that legal standard....
There is no cause here to depart from the standard set forth in Turner, for the District’s decision represents the kind of empirically based judgment that legislatures, not courts, are best suited to make. See Nixon, 528 U.S., at 402 [120 S.Ct. 897] (Breyer, J., concurring)....
The upshot is that the District’s objectives are compelling; its predictive judgments as to its law’s tendency to achieve those objectives are adequately supported; the law does impose a burden upon any self-defense interest that the Amendment seeks to secure; and there is no clear less restrictive alternative.
Heller, 554 U.S. at 689-90, 704-05, 714, 128 S.Ct. 2783 (Breyer, J., dissenting).
Justice Breyer expressly rejected strict scrutiny and rational basis review. Instead, he explicitly referred to intermediate scrutiny and relied on cases such as Turner Broadcasting that had applied intermediate scnitiny. See Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 189-225, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). And he discussed the strength of the government’s interest and the fit between the law and those interests, as the Court does when applying heightened *1277 scrutiny. It is thus evident that Justice Breyer’s Heller dissent advocated a form of intermediate scrutiny.[8]
The Court responded to Justice Breyer by rejecting his “judge-empowering ‘interest-balancing inquiry’ that ‘asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests.’ ” Heller, 554 U.S. at 634, 128 S.Ct. 2783 (quoting id. at 689-90, 128 S.Ct. 2783 (Breyer, J., dissenting)). The Court stated rather emphatically: “We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding ‘interest-balancing’ approach. The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all.” Id.
In rejecting a judicial interest-balancing approach, the Court explained that the Second Amendment “is the very product of an interest balancing by the people” that judges should not “now conduct for them anew.” Id. at 635, 128 S.Ct. 2783. The Court added that judges may not alter the scope of the Amendment because “[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” Id. at 634-35, 128 S.Ct. 2783. The Court emphasized that the scope of the right was determined by “historical justifications.” Id. at 635, 128 S.Ct. 2783. And the Court stated that tradition (that is, post-ratification history) matters because “examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification” is a “critical tool of constitutional interpretation.” Id. at 605, 128 S.Ct. 2783 (emphasis omitted).
To be sure, the Court noted in passing that D.C.’s handgun ban would fail under any level of heightened scrutiny or review the Court applied. Id. at 628-29, 128 S.Ct. 2783. But that was more of a gilding-the-lily observation about the extreme nature of D.C.’s law — and appears to have been a pointed comment that the dissenters *1278 should have found D.C.’s law unconstitutional even under their own suggested balancing approach — than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases. We know as much because the Court expressly dismissed Justice Breyer’s Turner Broadcasting intermediate scrutiny approach and went on to demonstrate how courts should consider Second Amendment bans and regulations — by analysis of text, history, and tradition. Id. at 626-27, 634-35, 114 S.Ct. 2445.
Is it possible, however, that the Heller Court was ruling out intermediate scrutiny but leaving open the possibility that strict scrutiny might apply? That seems highly unlikely, for reasons Justice Breyer himself pointed out in dissent:
Respondent proposes that the Court adopt a “strict scrutiny” test, which would require reviewing with care each gun law to determine whether it is “narrowly tailored to achieve a compelling governmental interest.” Abrams v. Johnson, 521 U.S. 74, 82 [117 S.Ct. 1925, 138 L.Ed.2d 285] (1997); see Brief for Respondent 54-62. But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws — prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales — whose constitutionality under a strict-scrutiny standard would be far from clear.
Id. at 688, 114 S.Ct. 2445 (Breyer, J., dissenting).
Justice Breyer thus perceived that the Court’s history- and tradition-based approach would likely permit governments to enact more gun laws and regulations than a strict scrutiny approach would allow. History and tradition establish that several gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court determined in Heller. If courts applied strict scrutiny, however, very few gun regulations would presumably be constitutional.
Even more to the point, as Justice Breyer also noted, the Court in Heller affirmatively approved a slew of gun laws— machine gun bans, concealed-carry laws, felon-in-possession laws, and the like— without analyzing them under strict scrutiny. The Court approved them based on a history- and tradition-based test, not strict scrutiny. Indeed, these laws might not have passed muster under a strict scrutiny analysis.
The Court’s later decision in McDonald underscores that text, history, and tradition guide analysis of gun laws and regulations. There, the Court again precluded the use of balancing tests; furthermore, it expressly rejected judicial assessment of “the costs and benefits of firearms restrictions” and stated that courts applying the Second Amendment thus would not have to make “difficult empirical judgments” about the efficacy of particular gun regulations. 130 S.Ct. at 3050 (controlling opinion of Alito, J.).
That language from McDonald is critically important because strict and intermediate scrutiny obviously require assessment of the “costs and benefits” of government regulations and entail “difficult empirical judgments” about their efficacy — precisely what McDonald barred. McDonald’s rejection of such inquiries, which was even more direct than Heller's, is flatly incompatible with a strict or intermediate scrutiny approach to gun regulations.
*1279 That conclusion is fortified by a careful examination of the back and forth in McDonald between Justice Alito’s controlling opinion and Justice Breyer’s dissent.
In his McDonald dissent, Justice Breyer explained at some length that he was concerned about the practical ramifications of Heller and McDonald because judges would have great difficulty assessing gun regulations under heightened scrutiny (whether it might be called strict or intermediate or something else on that heightened scrutiny spectrum). He stated that determining the constitutionality of a gun regulation would “almost always require the weighing of the constitutional right to bear arms against the primary concern of every government — a concern for the safety and indeed the lives of its citizens.” 130 S.Ct. at 3126 (Breyer, J., dissenting) (internal quotation marks omitted). “Given the competing interests, courts will have to try to answer empirical questions of a particularly difficult kind.” Id. He listed a variety of possible gun laws that would raise such difficult empirical questions, including laws regulating semi-automatic rifles and laws imposing registration requirements. Id. Justice Breyer asserted that assessing the constitutionality of those laws under heightened scrutiny would require difficult judicial evaluations of the effectiveness of particular gun laws. Justice Breyer asked: “How can the Court assess the strength of the government’s regulatory interests without addressing issues of empirical fact? How can the Court determine if a regulation is appropriately tailored without considering its impact? And how can the Court determine if there are less restrictive alternatives without considering what will happen if those alternatives are implemented?” Id. at 3127.
The questions identified by Justice Breyer are of course the kinds of questions that courts ask when applying heightened scrutiny. So how did the Court respond to Justice Breyer? The Court simply rejected the premise of Justice Breyer’s criticism. Those kinds of difficult assessments would not need to be made, the Court said, because courts would not be applying that kind of test or scrutiny: “Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in Heller recommended an interest-balancing test, the Court specifically rejected that suggestion. ‘The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon.’ ” Id. at 3050 (controlling opinion of Alito, J.) (citation omitted) (quoting Heller, 554 U.S. at 684, 128 S.Ct. 2783). The Court also reiterated that “longstanding” gun regulations were constitutionally permissible. Id. at 3047.
The McDonald Court’s response to Justice Breyer is quite telling for our purposes: The Court dismissed the suggestion that courts in Second Amendment cases would need to assess the strength of the government’s regulatory interests, or determine whether the regulation was appropriately tailored, or consider the alternatives. In other words, the Court declined to conduct the kinds of inquiries that would need to be conducted under a form of strict or intermediate scrutiny.
But Justice Breyer then asked: From where did the Court derive the exceptions the Court listed in Heller and McDonald allowing laws that ban concealed carry, *1280 possession by a felon, and the like? Justice Breyer suggested that the Court “simply invented rules that sound sensible.” Id. at 3127 (Breyer, J., dissenting). But the Court responded that, no, it was not inventing rules but rather was holding that the scope of the right was determined by text, history, and tradition — and that “longstanding regulatory measures” were therefore permissible. Id. at 3047 (controlling opinion of Alito, J.). As the Court had explained in Heller, the scope of the right was determined by text, history, and tradition, and such longstanding laws were within the historical understanding of the scope of the right. See also McDonald, 130 S.Ct. at 3050, 3056 (Scalia, J., concurring) (Court’s approach “makes the traditions of our people paramount”; “traditional restrictions” on the right are permissible).
D
Although Heller and McDonald rejected judicial interest balancing, the majority opinion here applies intermediate scrutiny. The majority opinion does so because it says that heightened scrutiny tests are not actually balancing tests and thus were not precluded by the Supreme Court’s rejection of balancing tests. I disagree with the majority opinion’s attempt to distinguish Heller and McDonald in this way.
To begin with, as explained above, the Court in my view went further in Heller and McDonald than just rejecting the concept of balancing tests. The Court emphasized the role of history and tradition; it rejected not only balancing but also examination of costs and benefits; it disclaimed the need for difficult empirical judgments; it specifically rejected Justice Breyer’s approach, which was a form of intermediate scrutiny as applied in Turner Broadcasting; and it prospectively blessed certain laws for reasons that could be (and were) explained only by history and tradition, not by analysis under a heightened scrutiny test.
It is ironic, moreover, that Justice Breyer’s dissent explicitly advocated an approach based on Turner Broadcasting; that the Heller majority flatly rejected that Turner Broadcasting-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on Turner Broadcasting. See Heller, 554 U.S. at 690, 704-05, 128 S.Ct. 2783 (Breyer, J., dissenting) (citing Turner Broadcasting, 520 U.S. 180, 117 S.Ct. 1174); Heller, 554 U.S. at 634-35, 128 S.Ct. 2783; Maj. Op. at 1257, 1259-60 (citing Turner Broadcasting, 520 U.S. 180, 117 S.Ct. 1174; Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).
In addition, the premise of the majority opinion’s more general point — that Heller's rejection of balancing tests does not mean it rejected strict and intermediate scrutiny — is incorrect. Strict and intermediate scrutiny are balancing tests and thus are necessarily encompassed by Heller's more general rejection of balancing.
The heightened scrutiny approach largely took hold as a First Amendment principle — articulated most prominently by Justices Frankfurter and Harlan — to uphold laws that infringed free speech rights but were deemed to be justified by an overriding public purpose, often in cases involving speech by Communists. See Konigsberg v. State Bar of California, 366 U.S. 36, 49-52, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Barenblatt v. United States, 360 U.S. 109, 126-27, 134, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Sweezy v. New Hampshire, 354 U.S. 234, 265-67, 77 S.Ct. *1281 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in judgment). From the beginning, it was recognized that those tests were balancing tests. In Barenblatt, for example, one of the early cases applying a form of what we now call strict scrutiny, the Court stated that First Amendment rights may be overcome based on “a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown,” and that the “subordinating interest of the State must be compelling in order to overcome the individual constitutional rights at stake.” 360 U.S. at 126-27, 79 S.Ct. 1081 (internal quotation marks omitted). In Konigsberg, the Court similarly explained that laws limiting speech could be justified by “valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved.” 366 U.S. at 50-51, 81 S.Ct. 997. Writing for the Court, Justice Harlan noted that the test required an “appropriate weighing of the respective interests involved.” Id. at 51, 81 S.Ct. 997. In dissent, Justice Black objected to a “doctrine that permits constitutionally protected rights to be ‘balanced’ away whenever a majority of this Court thinks that a State might have interest sufficient to justify abridgment of those freedoms.” Id. at 61, 81 S.Ct. 997 (Black, J., dissenting).
As in their original formulations, the successor strict and intermediate scrutiny tests applied today remain quintessential balancing inquiries that focus ultimately on whether a particular government interest is sufficiently compelling or important to justify an infringement on the individual right in question. Cf. Denver Area Educ. Telecomms. Consortium, Inc. v. FCC, 518 U.S. 727, 740-41, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (the Court’s application of varying levels of scrutiny is a process of “restat[ing] and refin[ing] ... basic First Amendment principles, adopting them more particularly to the balance of competing interests and the special circumstances of each field of application”); Employment Div., Dep’t of Human Res. of Or. v. Smith, 494 U.S. 872, 889 n. 5, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (applying strict scrutiny to general laws that burden religious practice would require judges to “regularly balance against the importance of general laws the significance of religious practice”); Mario L. Barnes & Erwin Chemerinsky, The Once and Future Equal Protection Doctrine?, 43 Conn. L. Rev. 1059, 1080.(2011) (“The levels of scrutiny are essentially balancing tests— each test determines how the weights on the scale are to be arranged. Strict scrutiny puts the weights strongly against the government and rational basis places the weights in its favor.”); Alan Brownstein, The Religion Clauses as Mutually Reinforcing Mandates, 32 Cardozo L. Rev. 1701, 1721-22 (2011) (though strict scrutiny is not as “ad hoc, subjective and indeterminate” as a “multi-factor balancing test” or “intermediate level scrutiny,” even under strict scrutiny “there will be some cases, where the state’s interest is authentic and substantial, which will require balancing”); Stephen A. Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny, 48 Am. J. Legal Hist. 355, 375 (2006) (“compelling state interest doctrine” is a “balancing test”) (internal quotation marks omitted); Darrell A.H. Miller, Retail Rebellion and the Second Amendment, 86 Ind. L.J. 939, 967 (2011) (“both Heller and McDonald indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing”).
*1282 To be sure, application of the strict and intermediate scrutiny tests yields categorical results and rules over time. And strict scrutiny in particular places a heavy thumb on the scale in favor of the individual right in question, meaning the balance is often struck against the government. But the tests are undoubtedly balancing tests that require a contemporary judicial assessment of the strength of the asserted government interests in imposing a particular regulation. If that interest is deemed sufficiently strong, and the law is deemed to be appropriately tailored to serving that interest given the potential alternatives, then the law generally overcomes the individual right. That is a form of interest balancing. It is true that strict and intermediate scrutiny come in a variety of flavors and are not always applied in the exact same way in all settings (as illustrated by Justice Breyer’s extensive explanation in his Heller dissent). But they always involve at least some assessment of whether the law in question is sufficiently important to justify infringement on an individual constitutional right. That’s balancing. And Heller and McDonald rejected the use of balancing tests — including, therefore, strict or intermediate scrutiny— in fleshing out the scope of the Second Amendment right.
Of course, as noted above, Heller and McDonald didn’t just reject interest balancing. The Court went much further by expressly rejecting Justice Breyer’s intermediate scrutiny approach, disclaiming cost-benefit analysis, and denying the need for empirical inquiry. By doing so, the Court made clear, in my view, that strict and intermediate scrutiny are inappropriate.
In short, I do not see how Heller and McDonald can be squared with application of strict or intermediate scrutiny to D.C.’s gun laws. The majority opinion here refers to the levels of scrutiny as “familiar.” Maj. Op. at 1266. As one commentator has stated, however, “the search for the familiar may be leading courts and commentators astray: The central disagreement in Heller was a debate not about strict scrutiny and rational basis review but rather about categoricalism and balancing.” Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L. Rev. at 879.[9] That disagreement in Heller was resolved in favor of categoricalism — with the categories defined by text, history, and tradition — and against balancing tests such as strict or intermediate scrutiny or reasonableness.
E
It might be objected that the Supreme Court could not have intended a test cabined by text, history, and tradition (and analogues thereto when addressing modern weapons or conditions) given the prevalence of strict and intermediate scrutiny tests in the Court’s jurisprudence regarding some other constitutional rights. I disagree with that suggestion and think it is based on too narrow a view of the Court’s overall constitutional jurisprudence.
Taking a step back, we know the Supreme Court has developed an array of rules, tests, and standards specific to each right. Particularly for a lower court, it is difficult therefore to apply an overarching *1283 interpretive approach to questions of constitutional law that are necessarily guided by decades of precedent interpreting different provisions of the Constitution under different methodologies. Some individual constitutional rights are analyzed under heightened (strict or intermediate) scrutiny, some under categorical tests divined from text, history, and tradition, some by reasonableness tests, some in other ways.
Strict and intermediate scrutiny today are primarily used in substantive due process and equal protection cases, and for certain aspects of First Amendment free speech doctrine. Strict and intermediate scrutiny tests are not employed in the Court’s interpretation and application of many other individual rights provisions of the Constitution.
For example, the Court has not typically invoked strict or intermediate scrutiny to analyze the Jury Trial Clause, the Establishment Clause, the Self-Incrimination Clause, the Confrontation Clause, the Cruel and Unusual Punishments Clause, or the Habeas Corpus Clause, to name a few. See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). In a recent landmark case concerning the Confrontation Clause, the Court stated in language quite similar to Heller’s that by “replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable.” Crawford v. Washington, 541 U.S. 36, 67-68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Even in the First Amendment case law, which the majority opinion here looks to for guidance, the Court has not used strict or intermediate scrutiny when considering bans on categories of speech. In United States v. Stevens, the Court echoed Heller: “The First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document ‘prescribing limits, and declaring that those limits may be passed at pleasure.’ ” — U.S. -, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) (quoting Marburg v. Madison, 5 U.S. 137, 178, 1 Cranch 137, 2 L.Ed. 60 (1803)); see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 125, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring) (When the “regulated content has the full protection of the First Amendment,” that “is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the State can show that the statute is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.”) (internal quotation marks omitted).
In short, it would hardly have been unusual or unthinkable for the Supreme Court to set forth a Second Amendment test based on text, history, and tradition— rather than a heightened scrutiny approach. (Indeed, in Heller, the Supreme *1284 Court affirmed this Court’s decision, which similarly declined to adopt a strict or intermediate scrutiny test.) Therefore, I would take the Supreme Court’s words in Heller and McDonald at face value and not superimpose on those opinions a strict or intermediate scrutiny test that the Court declined to apply.
F
To sum up so far: Because the Supreme Court in Heller did not adopt a strict or intermediate scrutiny test and rejected judicial interest balancing, I must disagree with the majority opinion’s decision in this case to adopt the intermediate scrutiny balancing test. In my view, it is a severe stretch to read Heller, as the majority opinion does, as consistent with an intermediate scrutiny balancing test. The Supreme Court struck down D.C.’s handgun ban because handguns have not traditionally been banned and are in common use by law-abiding citizens, not because the ban failed to serve an important government interest and thus failed the intermediate scrutiny test. And the Court endorsed certain gun laws because they were rooted in history and tradition, not because they passed the intermediate scrutiny test.
One final aside about the appropriate test to apply: Even if it were appropriate to apply one of the levels of scrutiny after Heller, surely it would be strict scrutiny rather than the intermediate scrutiny test adopted by the majority opinion here. Heller ruled that the right to possess guns is a core enumerated constitutional right and rejected Justice Breyer’s suggested Turner Broadcasting intermediate scrutiny approach. And McDonald later held that “the right to keep and bear arms” is “among those fundamental rights necessary to our system of ordered liberty.” 130 S.Ct. at 3042.
For those fundamental substantive constitutional rights that the Court has subjected to a balancing test and analyzed under one of the levels of scrutiny — for example, the First Amendment freedom of speech and the rights protected by substantive due process — the Court has generally employed strict scrutiny to assess direct infringements on the right. See, e.g., Citizens United v. FEC, — U.S. -, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (First Amendment strict scrutiny in context of infringement on “political speech”); Boy Scouts of America v. Dale, 580 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (First Amendment strict scrutiny in context of infringement on freedom of association); United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (First Amendment strict scrutiny in context of content-based speech regulation); Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (substantive due process doctrine “forbids the government to infringe fundamental liberty interests ... unless the infringement is narrowly tailored to serve a compelling state interest”) (internal quotation marks and alteration omitted); see generally Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1271 (2007) (“the Supreme Court adopted the strict scrutiny formula as its generic test for the protection of fundamental rights”).
Strict scrutiny requires the government to show that a law is narrowly tailored to serve a compelling state interest. See Citizens United, 130 S.Ct. at 898 (strict scrutiny “requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve *1285 that interest”) (internal quotation marks omitted). This test strongly favors the individual right in question. See Brown v. Entertainment Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (strict scrutiny “is a demanding standard”); Vieth v. Jubelirer, 541 U.S. 267, 294, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion) (strict scrutiny imposes “a strong presumption of invalidity” with a “thumb on the scales” in favor of the individual right); Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (under strict scrutiny, “a heavy burden of justification is on the State”).
It is especially inappropriate for the majority opinion here to apply intermediate scrutiny rather than strict scrutiny to D.C.’s ban on semi-automatic rifles. No court of appeals decision since Heller has applied intermediate scrutiny to a ban on a class of arms that have not traditionally been banned and are in common use. A ban on a class of arms is not an “incidental” regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are not subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not traditionally been banned.
G
In sum, our task as a lower court here is narrow and constrained by precedent. We need not squint to divine some hidden meaning from Heller about what tests to apply. Heller was up-front about the role of text, history, and tradition in Second Amendment analysis — and about the absence of a role for judicial interest balancing or assessment of costs and benefits of gun regulations. Gun bans and gun regulations that are longstanding — or, put another way, sufficiently rooted in text, history, and tradition — are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right. Our role as a lower court is simply to apply the test announced by Heller to the challenged provisions of D.C.’s new gun laws.
II
Whether we apply the Heller history- and tradition-based approach or strict scrutiny or even intermediate scrutiny, D.C.’s ban on semi-automatic rifles fails to pass constitutional muster. D.C.’s registration requirement is likewise unconstitutional.
A
The first issue concerns D.C.’s ban on most semi-automatic rifles.[10] A semi-automatic gun “fires only one shot with each pull of the trigger” and “requires no manual manipulation by the operator to place another round in the chamber after each round is fired.” Staples v. United States, 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). That is in contrast to *1286 an automatic gun — also known as a machine gun — which “fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.” Id.[11]
The vast majority of handguns today are semi-automatic.[12] In Heller, the Supreme Court ruled that D.C.’s law banning handguns, including semi-automatic handguns, was unconstitutional. District of Columbia v. Heller, 554 U.S. 570, 628-29, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). This case concerns semi-automatic rifles.[13] As with handguns, a significant percentage of rifles are semi-automatic. D.C. asks this Court to find that the Second Amendment protects semi-automatic handguns but not semi-automatic rifles.
There is no basis in Heller for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles.
As an initial matter, considering just the public safety rationale invoked by D.C., semi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed. As was noted by the dissent in Heller, handguns “are the overwhelmingly favorite weapon of armed criminals.” 554 U.S. at 682, 128 S.Ct. 2783 (Breyer, J., dissenting); see also FBI, Crime in the United States, 2009 tbl.20 (2010). So it would seem a bit backwards — at least from a public safety perspective — to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. Indeed, at oral argument, the excellent Solicitor General for D.C. acknowledged that “an argument could be made that the government interest in banning handguns is just as compelling, if not more compelling” than the government interest in banning semi-automatic rifles. Tr. of Oral Arg. at 35. He added that “the government’s interest may be more compelling with regard to handgun[s].” Id. at 36. Counsel’s frank acknowledgment highlights the serious hurdle that Heller erects in the way of D.C.’s attempt to ban semiautomatic rifles. Put simply, it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles.[14]
More to the point for purposes of the Heller analysis, the Second Amendment as *1287 construed in Heller protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under Heller.
The first commercially available semiautomatic rifles, the Winchester Models 1903 and 1905 and the Remington Model 8, entered the market between 1903 and 1906. See John Henwood, The 8 and the 81: A History of Remington’s Pioneer Autoloading Rifles 5 (1993); John Hen-wood, The Forgotten Winchesters: A History of the Models 1905, 1907, and 1910 Self-Loading Rifles 2-6 (1995). (The first semi-automatic shotgun, designed by John Browning and manufactured by Remington, hit the market in 1905 and was a runaway commercial success. See Hen-wood, 8 and the 81, at 4.) Other arms manufacturers, including Standard Arms and Browning Arms, quickly brought their own semi-automatic rifles to market. See id. at 64-69. Five-shot magazines were standard, but as early as 1907, Winchester was offering the general public ten-shot magazines for use with its .351 caliber semi-automatic rifles. See Henwood, The Forgotten Winchesters 22-23. Many of the early semi-automatic rifles were available with pistol grips. See id. at 117-24. These semi-automatic rifles were designed and marketed primarily for use as hunting rifles, with a small ancillary market among law enforcement officers. See Henwood, 8 and the 81, at 115-21.
By contrast, full automatics were developed for the battlefield and were never in widespread civilian use in the United States. Rifle-caliber machine guns (excluding the Gatling gun, which required hand cranking) first saw widespread use in the European colonial powers’ African conquests of the 1890s. See John Ellis, The Social History of the Machine Gun 79-107 (1986). Automatic, pistol-caliber machine guns were fielded by European militaries toward the end of World War I. The Thompson machine gun (commonly known as the “Tommy gun”) entered commercial sale in the United States in the mid-1920s but saw very limited civilian use outside of organized crime and law enforcement. See Lee Kennett & James LaVerne Anderson, The Gun in America 203-04 (1975). Within less than a decade, the Tommy gun and other automatic weapons had been subjected to comprehensive federal regulation. National Firearms Act, ch. 757, 48 Stat. 1236 (1934); see also 18 U.S.C. § 922(o).
Semi-automatic rifles remain in common use today, as even the majority opinion here acknowledges. See Maj. Op. at 1261 (“We think it clear enough in the record that semi-automatic rifles ... are indeed in ‘common use,’ as the plaintiffs contend.”). According to one source, about 40 percent of rifles sold in 2010 were semiautomatic. See Nicholas J. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy ch. 1 (forthcoming 2012). The AR-15 is the most popular semi-automatic rifle; since 1986, about two million semi-automatic AR-15 rifles have been manufactured. J.A. 84 (Declaration of Firearms Researcher Mark Overstreet). In 2007, the AR-15 alone accounted for 5.5 percent of firearms and 14.4 percent of rifles produced in the United States for the domestic market. Id. A brief perusal of the website of a popular American gun seller underscores the point that semi-automatic rifles are quite common in the United States. See, e.g., Cabela’s, http://www.cabelas.com. Semi-automatic rifles are commonly used for self-defense in the home, hunting, target shoot *1288 ing, and competitions. J.A. 137 (Declaration of Firearms Expert Harold E. Johnson). And many hunting guns are semiautomatic. Id.
Although a few states and municipalities ban some categories of semi-automatic rifles, most of the country does not, and even the bans that exist are significantly narrower than D.C.’s. What the Supreme Court said in Heller as to D.C.’s handgun ban thus applies just as well to D.C.’s new semi-automatic rifle ban: “Few laws in the history of our Nation have come close to the severe restriction of the District’s” law. 554 U.S. at 629, 128 S.Ct. 2783.
What is more, in its 1994 decision in Staples, the Supreme Court already stated that semi-automatic weapons “traditionally have been widely accepted as lawful possessions.” 511 U.S. at 612, 114 S.Ct. 1793. Indeed, the precise weapon at issue in Staples was the AR-15. The AR-15 is the quintessential semi-automatic rifle that D.C. seeks to ban here. Yet as the Supreme Court noted in Staples, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. By contrast, as the Court stated in Staples and again in Heller, short-barreled shotguns and automatic “M-16 rifles and the like” are not in common use and have been permissibly banned by Congress. Heller, 554 U.S. at 625, 627, 128 S.Ct. 2783; see also Staples, 511 U.S. at 611-12, 114 S.Ct. 1793 (“certain categories of guns — no doubt including the machine-guns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation — ... have the same quasi-suspect character we attributed to owning hand grenades,” but “guns falling outside those categories traditionally have been widely accepted as lawful possessions”); 18 U.S.C. § 922(o)(1) (“it shall be unlawful for any person to transfer or possess a machinegun”).[15]
The Supreme Court’s statement in Staples that semi-automatic rifles are traditionally and widely accepted as lawful possessions further demonstrates that such guns are protected under the Heller history- and tradition-based test. The government may still ban automatic firearms (that is, machine guns), which traditionally have been banned. But the government may not generally ban semi-automatic guns, whether semi-automatic rifles, shotguns, or handguns.
Even if it were appropriate to apply some kind of balancing test or level of scrutiny to D.C.’s ban on semi-automatic rifles, the proper test would be strict scrutiny, as explained above. See supra Part I.F. That is particularly true where, as here, a court is analyzing a ban on a class of arms within the scope of Second Amendment protection. If we are to apply strict scrutiny, we must do so in a manner consistent with Hellers holding that D.C.’s handgun ban was unconstitutional. But D.C. cannot show a compelling interest in banning semi-automatic rifles because the necessary implication of the decision in Heller is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns.
For its part, the majority opinion analyzes D.C.’s ban on semi-automatic rifles under an intermediate scrutiny balancing test. Even if the majority opinion were *1289 right that intermediate scrutiny is the proper test, the majority opinion’s application of intermediate scrutiny here is unconvincing: The fundamental flaw in the majority opinion is that it cannot persuasively explain why semi-automatic handguns are constitutionally protected (as Heller held) but semi-automatic rifles are not.
In attempting to distinguish away Hellers protection of semi-automatic handguns, the majority opinion suggests that semi-automatic rifles are almost as dangerous as automatic rifles (that is, machine guns) because semi-automatic rifles fire “almost as rapidly.” Maj. Op. at 1263. Putting aside that the majority opinion’s data indicate that semi-automatics actually fire two-and-a-half times slower than automatics, id., the problem with the comparison is that semi-automatic rifles fire at the same general rate as semi-automatic handguns. And semi-automatic handguns are constitutionally protected under the Supreme Court’s decision in Heller. So the majority opinion cannot legitimately distinguish Heller on that basis. See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1484 (2009) (“The laws generally define assault weapons to be a set of semiautomatic weapons (fully automatic weapons have long been heavily regulated, and lawfully owned fully automatics are very rare and very expensive) that are little different from semiautomatic pistols and rifles that are commonly owned by tens of millions of law-abiding citizens. ‘Assault weapons’ are no more ‘high power’ than many other pistols and rifles that are not covered by the bans.”) (footnote omitted).[16]
The majority opinion next contends that semi-automatic handguns are good enough to meet people’s needs for self-defense and that they shouldn’t need semi-automatic rifles. But that’s a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. Indeed, Heller itself specifically rejected this mode of reasoning: “It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.” 554 U.S. at 629, 128 S.Ct. 2783; see also Parker v. District of Columbia, 478 F.3d 370, 400 (D.C.Cir.2007) (“The District contends that since it only bans one type of firearm, ‘residents still have access to hundreds more,’ and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted.”), aff'd sub nom. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637. Furthermore, the majority opinion’s assertion does not sufficiently account for the fact that rifles, but typically not handguns, are used for hunting. Cf. Heller, 554 U.S. at 599, 128 S.Ct. 2783 (most founding-era Americans “undoubtedly” thought right to own firearms “even more important for self-defense and hunting” than for militia service).
*1290 In support of its law, D.C. suggests that semi-automatic rifles are “offensive” and not just “defensive.” But that is plainly true of semi-automatic handguns as well (after all, handguns are far and away the guns most often used in violent crimes), and yet the Supreme Court held semiautomatic handguns to be constitutionally protected. Moreover, it’s hard to see why, if a gun’ is effective for “offense,” it might not also be effective for “defense.” If a gun is employed by criminals on the offense who are willing to violate laws and invade homes, for example, their potential victims will presumably want to be armed with similarly effective weapons for their defense. Cf. Heller, 554 U.S. at 711, 128 S.Ct. 2783 (Breyer, J., dissenting) (“the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous”). There is no reason to think that semiautomatic rifles are not effective for self-defense in the home, which Heller explained is a core purpose of the Second Amendment right. The offense/defense distinction thus doesn’t advance the analysis here, at least in part because it is the person, not the gun, who determines whether use of the gun is offensive or defensive. Perhaps D.C. — by referring to the offense/defense distinction — is simply intending to say that semi-automatic rifles are especially dangerous. But it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns, and the Supreme Court has already held semi-automatic handguns to be constitutionally protected.
D.C. repeatedly refers to the guns at issue in this case as “assault weapons.” But if we are constrained to use D.C.’s rhetoric, we would have to say that handguns are the quintessential “assault weapons” in today’s society; they are used far more often than any other kind of gun in violent crimes. See Bureau of Justice Statistics, Pub. No. 194820, Weapon Use and Violent Crime 3 (2003) (87% of violent crimes committed with firearms between 1993 and 2001 were committed with handguns). So using the rhetorical term “assault weapon” to refer to semi-automatic rifles does not meaningfully distinguish semi-automatic rifles from semi-automatic handguns. Nor does the rhetorical term “assault weapon” help make the case that semi-automatic rifles may be banned even though semi-automatic handguns are constitutionally protected.
Under intermediate scrutiny, yet another problem with D.C.’s law is its tailoring. The law is not sufficiently tailored even with respect to the category of semi-automatic rifles. It bans certain semi-automatic rifles but not others — with no particular explanation or rationale for why some made the list and some did not. The list appears to be haphazard. It does not reflect the kind of tailoring that is necessary to justify infringement of a fundamental right, even under the more relaxed intermediate scrutiny test.
In short, the majority opinion cannot persuasively explain why semi-automatic handguns are constitutionally protected but semi-automatic rifles are not. In Heller, D.C. argued that it could ban handguns because individuals could still own rifles. That argument failed. Here, D.C. contends that it can ban rifles because individuals can still own handguns. D.C.’s at-least-you-can-still-possess-other-kinds-of-guns argument is no more persuasive this time around. Under the Heller history- and tradition-based test, or the strict scrutiny test, or even the majority opinion’s own intermediate scrutiny test, the *1291 D.C. ban on semi-automatic rifles is unconstitutional.
B
The second main issue on appeal concerns D.C.’s gun registration regime. D.C. requires registration of all guns lawfully possessed in D.C. The Supreme Court in Heller expressly allowed “longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” 554 U.S. at 626-27, 128 S.Ct. 2783 (emphasis added). The Court added that regulations and exceptions should be judged based on their “historical justifications.” Id. at 635, 128 S.Ct. 2783. In McDonald, the Court summarized the point this way: “We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as ‘prohibitions on the possession of firearms by felons and the mentally ill,’ ‘laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.’ ” McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.) (quoting Heller, 554 U.S. at 626-27, 128 S.Ct. 2783).[17]
The fundamental problem with D.C.’s gun registration law is that registration of lawfully possessed guns is not “longstanding.” Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States and, indeed, remains highly unusual today.
In considering D.C.’s registration requirement, it’s initially important to distinguish registration laws from licensing laws. Licensing requirements mandate that gun owners meet certain standards or pass certain tests before owning guns or using them in particular ways. Those laws can advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public. For example, many jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements on persons who wish to carry such weapons. Registration requirements, by contrast, require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can. For that reason, registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership. It is true that registration requirements also provide a hook to convict (and potentially flip) criminals who are suspected of having committed other illegal acts, but as the majority opinion recognizes, that is a “circular” and constitutionally unacceptable rationale for requiring registration with respect to a core enumerated constitutional right. Maj. Op. at 1258 n.*.
*1292 Likewise, it’s also important at the outset to distinguish registration requirements imposed on gun oumers from record-keeping requirements imposed on gun sellers. Some record-keeping requirements on gun sellers are traditional and common. Thus, the government may constitutionally impose certain record-keeping requirements on the sellers of guns. See Heller, 554 U.S. at 627, 128 S.Ct. 2783 (listing “conditions and qualifications on the commercial sale of arms” as being within category of traditional gun regulations).
The issue here, however, is registration of all guns owned by people in the District of Columbia. As D.C. acknowledges, there is not, and never has been, a “comprehensive federal system of firearm registration.” Council Comm, on Pub. Safety & the Judiciary, Comm. Rep. on B. 17-843, at 3 (D.C. 2008). Similarly, the vast majority of states have not traditionally required registration of lawfully possessed guns. The majority opinion cites several state laws that have existed since the beginning of the 20th Century. Maj. Op. at 1253-54. But those state laws generally required record-keeping by gun sellers, not registration of all lawfully possessed guns by gun oumers. There certainly is no tradition in the United States of gun registration imposed on all guns. And laws regulating gun sellers provide no support for D.C.’s registration requirement, which compels every gun owner to register every gun he or she lawfully possesses.
Even if modern laws alone could satisfy Hellers history- and tradition-based test, there presumably would have to be a strong showing that such laws are common in the states. Cf. Kennedy v. Louisiana, 554 U.S. 407, 423-26, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (only six states permitting death penalty for child rapists shows national consensus against it). Such a showing cannot be made with respect to registration requirements. Today, most states require no registration for any firearms; only seven states require registration for some firearms; and only Hawaii requires registration for all firearms. And even Hawaii does not impose all of the onerous requirements associated with registration that D.C. does.[18] Put simply, D.C.’s registration law is the strictest in the Nation, by D.C.’s own admission. See Firearms Control: Hearing of the H.C. Comm, on Home Aff. (U.K. 2010) (statement of Peter Nickles, D.C. Att’y Gen.) (acknowledging common view that D.C. has “the strictest gun laws in the United States”); see also Haw.Rev.Stat. § 134-3(a)-(b); Cal.Penal Code §§ 11106, 12276, 12276.1, 12276.5, 12280, 12285(a) (registration of handguns and certain rifles that are otherwise banned); Conn. GemStat. § 53-202d(a) (registration of grandfathered rifles that are otherwise banned); Md.Code Ann., Crim. Law § 4-303(b) (registration of grandfathered pistols that are otherwise banned); N.J. Stat. Ann. §§ 2C:39-5(f), *1293 2C:58-12 (registration of grandfathered weapons that are otherwise banned); La. Rev.Stat. Ann. §§ 40:1781, 40:1783 (registration of limited types of firearms); Mich. Comp. Laws § 28.422 (de facto registration of pistols).
Because the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, D.C.’s registration law— which is the strictest in the Nation and mandates registration of all guns — does not satisfy the history- and tradition-based test set forth in Heller and later McDonald.
D.C. contends that registration is a longstanding requirement in American law because early militia laws required militiamen to submit arms for inspection. See Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America, 25 Law & Hist. Rev. 139, 161 (2007). But D.C.’s attempt to analogize its registration law to early militia laws is seriously flawed for two reasons. First, those early militia laws applied only to militiamen, not to all citizens. In general, men over age 45 and women did not have to comply with such laws. See Heller, 554 U.S. at 580, 128 S.Ct. 2783 (“the militia in colonial America consisted of a subset of the people — those who ' were male, able bodied, and within a certain age range”) (internal quotation marks omitted). Second, militia members were required to submit for inspection only one or a few firearms, not all of their firearms. That’s because the purpose of those early militia requirements was not registration of firearms, but rather simply to ensure that the militia was well-equipped. See, e.g., An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (1784), in 11 The Statutes at Large; Being a Collection of All the Laws of Virginia 476, 476-79 (William Waller Hening ed., Richmond, George Cochran 1823) (The “defence and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty.... [E]very of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements and ammunition ready to be produced whenever called for by his commanding officer.”).
Those militia requirements were a far cry from a registration requirement for all firearms. Those laws therefore provide no meaningful support for D.C.’s broad and unprecedented registration law. Nor has D.C. been able to find any other historical antecedents for its registration requirement. Yet again, what the Supreme Court said in Heller with respect to D.C.’s handgun ban applies as well to D.C.’s registration requirement: “Few laws in the history of our Nation have come close to the severe restriction of the District’s” law. 554 U.S. at 629, 128 S.Ct. 2783.
The Supreme Court’s 1939 decision in Miller further suggests that registration of all lawfully possessed guns is not permissible under the Second Amendment. See United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Miller involved a defendant’s conviction for possessing an unregistered firearm. If registration were constitutionally permissible for all lawfully possessed guns, the Court could simply have affirmed the conviction on that ground. Instead, the Miller Court analyzed whether the kind of gun Miller possessed — a sawed-off shotgun — was within the class of weapons protected by the Second Amendment. The Court’s approach suggested that the government could require registration only of guns that *1294 were outside the protection of the Second Amendment — namely, those classes of guns that the government had traditionally banned and that were not in common use, such as machine guns and sawed-off shotguns. Id. at 178, 59 S.Ct. 816; see also Heller, 554 U.S. at 622, 128 S.Ct. 2783 (emphasizing that Miller turned on the “type of weapon at issue”) (emphasis omitted). After all, if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment.
Perhaps recognizing the dearth of historical or precedential support for its registration law, D.C. says that licensing laws are “conceptually similar” to registration requirements. D.C. Br. at 19. D.C. also advances a similar argument when citing the record-keeping laws for sellers as support for its registration requirement. But to rely on those laws to support registration requirements on gun owners for all of their guns is to conduct the Heller analysis at an inappropriately high level of generality — akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials.
D.C.’s law requiring registration of all lawfully possessed guns in D.C. is not part of the tradition of gun regulation in the United States; it is the most stringent such law in the Nation; and it is significantly more onerous than traditional licensing requirements or record-keeping requirements imposed only on gun sellers. Registration requirements of the kind enacted by D.C. thus do not satisfy the Supreme Court’s history- and tradition-based test.
Even if it were proper to apply strict or intermediate scrutiny to D.C.’s registration law (as the majority opinion does), the registration requirement still would run into serious constitutional problems. If we were applying one of those balancing tests, however, I would remand: The current record is insufficient to render a final evaluation of the registration law under those balancing tests.
To begin with, it would be hard to persuasively say that the government has an interest sufficiently weighty to justify a regulation that infringes constitutionally guaranteed Second Amendment rights if the Federal Government and the states have not traditionally imposed — and even now do not commonly impose — such a regulation. Cf. Brown v. Entertainment Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2736, 180 L.Ed.2d 708 (2011) (considering First Amendment challenge to ban on sale of violent video games: “California’s argument would fare better if there were a longstanding tradition in this country of specially restricting children’s access to depictions of violence, but there is none.”) (emphasis added); United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) (considering First Amendment challenge to ban on depictions of animal cruelty: “we are unaware of any ... tradition excluding depictions of animal cruelty from ‘the freedom of speech’ codified in the First Amendment”) (emphasis omitted); Romer v. Evans, 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (“It is not within our constitutional tradition to enact laws of this sort.”).
Moreover, D.C.’s articulated basis for the registration requirement is that police officers, when approaching a house to execute a search or arrest warrant or take other investigative steps, will know wheth *1295 er the residents have guns. But that is at best a Swiss-cheese rationale because police officers obviously will assume the occupants might be armed regardless of what some central registration list might say. So this asserted rationale leaves far too many false negatives to satisfy strict or intermediate scrutiny with respect to burdens on a fundamental individual constitutional right.[19] D.C.’s registration law thus does not appear to be sufficiently tailored to advance a compelling or important government interest for purposes of the heightened scrutiny tests. That said, D.C. alludes to the possibility that other rationales might be asserted to support a registration requirement. Therefore, if I were applying a form of heightened scrutiny to the registration requirement, I would remand for further analysis of the interests that might be asserted. (It is possible, moreover, that the registration law might pass intermediate but not strict scrutiny.)
In any event, the proper test to apply is Hellers history- and tradition-based test. Because most of the Nation has never required — and even now does not require — registration of all lawfully possessed firearms, D.C.’s strict registration law is not “longstanding” in the United States. After Heller, some licensing requirements remain permissible, and some record-keeping requirements on gun sellers remain permissible. But D.C.’s registration law violates the Second Amendment as construed by the Supreme Court.
This is a case where emotions run high on both sides of the policy issue because of the vital public safety interests at stake. As one who was born here, grew up in this community in the late 1960s, 1970s, and 1980s, and has lived and worked in this area almost all of his life, I am acutely aware of the gun, drug, and gang violence that has plagued all of us. As a citizen, I certainly share the goal of Police Chief Cathy Lanier to reduce and hopefully eliminate the senseless violence that has persisted for too long and harmed so many. And I greatly respect the motivation behind the D.C. gun laws at issue in this case. So my view on how to analyze the constitutional question here under the relevant Supreme Court precedents is not to say that I think certain gun registration laws or laws regulating semi-automatic guns are necessarily a bad idea as a matter of policy. If our job were to decree what we think is the best policy, I would carefully consider the issues through that different lens and might well look favor *1296 ably upon certain regulations of this kind. But our task is to apply the Constitution and the precedents of the Supreme Court, regardless of whether the result is one we agree with as a matter of first principles or policy. See Texas v. Johnson, 491 U.S. 397, 420-21, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring) (“The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.”). A lower-court judge has a special obligation, moreover, to strictly and faithfully follow the lead of the “one supreme Court” established by our Constitution, regardless of whether the judge agrees or disagrees with the precedent.
D.C. believes that its law will help it fight violent crime. New government responsibilities are more significant. That said, the Supreme Court has long made clear that the Constitution disables the government from employing certain means to prevent, deter, or detect violent crime. See, e.g., Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In the words of the Supreme Court, the courts must enforce those constitutional rights even when they have “controversial public safety implications.” McDonald v. City of Chicago, - U.S. -, 130 S.Ct. 3020, 3045, 177 L.Ed.2d 894 (2010) (controlling opinion of Alito, J.).
As I read the relevant Supreme Court precedents, the D.C. ban on semi-automatic rifles and the D.C. gun registration requirement are unconstitutional and may not be enforced. We should reverse the judgment of the District Court and remand for proceedings consistent with this opinion.[20] I respectfully dissent.

. A semi-automatic gun "fires only one shot with each pull of the trigger” and "requires no manual manipulation by the operator to place another round in the chamber after each round is fired.” Staples v. United States, 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). A fully automatic gun— also known as a machine gun — "fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.” Id.

. Plaintiffs also challenge D.C.’s ban on magazines of more than 10 rounds. I would remand that issue for further factual development in the District Court. See infra note 20.

. In that sense, Heller was similar in its overarching practical and real-world ramifications to recent Supreme Court decisions such as Brown v. Entertainment Merchants Ass’n, - U.S. -, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011); Graham v. Florida, - U.S. -, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); and Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Those decisions disapproved novel or uncommon state legislative efforts to regulate beyond traditional boundaries in areas that affected enumerated individual constitutional rights — California's law banning sale of violent video games, Florida's law permitting life without parole for certain juvenile crimes, Louisiana’s law permitting the death penalty for certain rapes, and Colorado's law prohibiting gay people from receiving protection from discrimination. Because those laws were outliers, the decisions invalidating them did not cause major repercussions throughout the Nation. Heller was a decision in that same vein, in terms of its immediate practical effects in the United States. By contrast, of course, some Supreme Court decisions interpreting the Constitution's individual rights provisions not only are significant jurisprudentially but also have substantial practical impacts on common federal or state practices. See, e.g., Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Heller was not a decision of that kind.

. The Court in Heller stated as follows:
Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
We also recognize another important limitation on the right to keep and carry arms. *1273 Miller said, as we have explained, that the sorts of weapons protected were those "in common use at the time.” We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."
554 U.S. at 626-27, 128 S.Ct. 2783 (citations and footnote omitted). The Court in McDonald reiterated:
As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting amici cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in Heller.... We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill,” "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.”
130 S.Ct. at 3047 (controlling opinion of Ali-to, J.) (quoting Heller, 554 U.S. at 626-27, 128 S.Ct. 2783).

. The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered. Cf. Tr. of Oral Arg. at 44, Heller, 554 U.S. 570, 128 *1274 S.Ct. 2783 (No. 07-290) (Chief Justice Roberts: “Well, these various phrases under the different standards that are proposed, 'compelling interest,’ 'significant interest,’ 'narrowly tailored,’ none of them appear in the Constitution .... I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up.’’).

. It is not uncommon for courts to look to post-ratification history and tradition to inform the interpretation of a constitutional provision. For example, when interpreting the scope of the President's Article II power, the Court has relied on such history and tradition. See Dames & Moore v. Regan, 453 U.S. 654, 679 n. 8, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). So, too, the Court looked to traditional practice when analyzing an Establishment Clause issue related to legislative prayer. See Marsh v. Chambers, 463 U.S. 783, 786-92, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). That said, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. The Court in Marbury found unconstitutional a law passed by the First Congress. See Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). The practice of separate but equal was inconsistent with and repugnant to the text and original meaning of the Equal Protection Clause. See Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880). The existence of post-ratification examples of congressional exclusion of elected members did not persuade the Court in Powell v. McCormack: “That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date.” 395 U.S. 486, 546-47, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

. The fact that fewer gun laws might pass muster under strict scrutiny than under a history- and tradition-based approach is no doubt why the plaintiffs in Heller and here have advocated strict scrutiny.

. The Heller majority stated that Justice Breyer was not proposing any of the traditional forms of scrutiny “explicitly at least." 554 U.S. at 634, 128 S.Ct. 2783 (emphasis added). Justice Breyer ruled out strict scrutiny and rational basis review and relied heavily on Turner Broadcasting, which had applied a form of intermediate scrutiny. But he was not explicit about the label for his test, as the Heller majority opinion noted. In that regard, it bears mention that strict scrutiny and intermediate scrutiny can take on- different forms in different contexts that are sometimes colloquially referred to as, for example, strict-scrutiny-light or intermediate-scrutiny-plus or the like. How strong the government interest must be, how directly the law must advance that interest, how reasonable the alternatives must be — those questions are not always framed with precision in two clearly delineated categories, as opposed to points on a sliding scale of heightened scrutiny approaches. See, e.g., Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 387-88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) ("a contribution limit involving significant interference with associational rights could survive if the Government demonstrated that contribution regulation was closely drawn to match a sufficiently important interest”) (citations and internal quotation marks omitted); United States v. Virginia, 518 U.S. 515, 531, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (referring to "skeptical scrutiny” and "heightened review” of gender-based law).

. I recognize that some other courts of appeals have adopted approaches similar to the majority opinion’s approach here. Based on my reading of Heller and McDonald, I respectfully have come to a different conclusion.

. D.C.'s law bans semi-automatic rifles by listing specific guns that, as relevant here, share the characteristics of being a long gun and firing in a semi-automatic manner, and typically have features such as protruding pistol grips. D.C.Code § 7-2501.01(3A)(A)(i)(I). The statute also includes a catchall provision covering semi-automatic rifles that have certain additional features such as protruding pistol grips. Id. § 7-2501.01(3A)(A)(i)(IV).

. Under federal law, the “term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.” 26 U.S.C. § 5845(b).

. See Christopher S. Koper, Report to the Nat'l Inst, of Justice, U.S. Dep’t of Justice 81 (2004) (80% of handguns produced in 1993 were semi-automatic); Dep’t of Justice, Guns Used in Crime 3 (1995) ("Most new handguns are pistols rather than revolvers.”).

. Rifles are within a broader category referred to as "long guns.” Long guns, such as rifles and shotguns, are intended to be fired from the shoulder instead of with a single hand and are generally defined as being at least 16 to 18 inches long.

. Some would respond that the Second Amendment should not protect semi-automatic handguns either. But that option is not open to us after Heller. The question therefore is whether a sensible and principled constitutional line can be drawn between semiautomatic handguns and semi-automatic rifles. I think not. Such a line might be drawn out of a bare desire to restrict Heller as much as possible or to limit it to its facts, but that is not a sensible or principled constitutional line for a lower court to draw or a fair reading of the Heller opinion, in my view.

. In our decision in Parker, we similarly stated that handguns, shotguns, and rifles have traditionally been possessed by law-abiding citizens and are within the protection of the Second Amendment. Parker v. District of Columbia, 478 F.3d 370, 398 (D.C.Cir.2007), aff'd sub nom. Heller, 554 U.S. 570, 128 S.Ct 2783.

. In passing, the majority opinion here tosses out the possibility that Heller might protect handguns that are revolvers but not handguns that are semiautomatic pistols. See Maj. Op. at 1267-68. I find that an utterly implausible reading of Heller given the Court’s many blanket references to handguns and given that most handguns are semi-automatic.

. With respect to guns that the government has the constitutional authority to ban— namely, those classes of weapons that have traditionally been banned and are not in common use by law-abiding citizens — the government may of course impose registration as a lesser step. See United States v. Miller, 307 U.S. 174, 175 n. 1, 59 S.Ct 816, 83 L.Ed. 1206 (1939) (describing federal statute requiring registration of short-barreled rifles and shotguns, machine guns, and silencers transported in interstate commerce). But D.C.'s registration requirement applies to all guns, not just those it has the authority to ban.

. The D.C. law at issue here requires far more than basic registration of guns. It mandates, among other things, that a gun owner submit every pistol for a “ballistics identification procedure,” D.C.Code § 7-2502.03(d); appear in person to register a gun, § 7-2502.04; register only one pistol every 30 days, § 7-2502.03(e); and renew each registration certificate every three years, § 7-2502.07a(a). It is undisputed in this case that D.C.'s myriad registration-related requirements are unique — and uniquely burdensome — among laws in the United States. These additional registration-related requirements find even less support in history and tradition than the basic registration requirement.

. Moreover, citizens may not be forced to register in order to exercise certain other constitutionally recognized fundamental rights, such as to publish a blog or have an abortion. See Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense, 56 UCLA L. Rev. at 1546 (discussing impermissibility of registration requirements applied to free speech and abortion rights). In concluding that D.C.’s handgun registration requirement might satisfy intermediate scrutiny, the majority opinion notes that the government may require registration for voting. See Maj. Op. at 1254 — 55. But those laws serve the significant government interest of preventing voter fraud. The majority opinion also cites car registration laws. Id. Of course, there is no enumerated constitutional right to own a car. Perhaps more to the point, those laws help prevent theft and assist recovery of stolen cars. No similar interest justifies gun registration laws.
Oddly, the majority opinion says that a registration requirement is permissible for handguns but might be impermissible for rifles or other long guns. See id. That approach gives potentially greater constitutional protection to long guns than to handguns even though Heller held that handguns warrant the highest constitutional protection.

. The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court. In order to apply Heller's test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use. The parties here did not brief that question in much detail. Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the Heller test. Therefore, I would remand to the District Court for analysis of that issue.